Filed 10/23/24  R.G. v. A.M. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| R.G., | |
| Plaintiff and Appellant, | E082117 |
| v. | (Super.Ct.No. DVIN2200827) |
| A.M., | PUBLIC—REDACTED VERSION OF OPINION |
| Defendant and Respondent. | Redacts material from conditionally sealed record.[1]  (Cal. Rules of Court, rules 8.45, 8.46(f)(1)(2), and (g).) |

APPEAL from the Superior Court of Riverside County.  Russell L. Moore, Judge.

Affirmed.

---

[1] On April 29, 2024, we granted appellant's March 12, 2024, motion to place the unredacted reporter's transcript under seal and to seal portions of appellant's appendix, opening brief, and reporter's transcript to protect the privacy of the parties' minor child.  In accordance with California Rules of Court, rule 8.46(f)(1) and (f)(2), we have prepared both public (redacted) and sealed (unredacted) versions of this opinion.  We hereby order the unredacted version of this opinion sealed.

1

Family Violence Appellate Project, Judith Cheney Lewis, Jennafer Dorfman Wagner, Shuray Ghorishi; Wilmer Cutler Pickering Hale and Dorr, Thomas G. Sprankling, Kyle T. Edwards, Charlotte Geaghan-Breiner, Arjun Parikh for Plaintiff and Appellant.

No appearance for Defendant and Respondent.

Plaintiff and appellant R.G. appeals the denial of her request to renew a domestic violence restraining order (DVRO) pursuant to the Domestic Violence Prevention Act (DVPA) against defendant and respondent A.M.

R.G. and A.M. had two children together, Au.M. and Ro.G. (collectively, Minors), but they did not have a good relationship with A.M.  R.G. had obtained several restraining orders in the past to keep A.M. away from her and Minors.  In May 2022 R.G. was granted a one-year term DVRO against A.M. for acts committed by him, including unexpectedly showing up at her house and speaking with Minors when he was only allowed supervised visits with Minors.  He also called the police repeatedly to do welfare checks at R.G.'s house and at MGM's home over the period of several years.  A.M. was ordered to stay away from R.G. and to participate in a 52-week domestic violence program.  One year later, R.G. requested that the trial court renew the DVRO permanently or for a five-year term.  The trial court found no evidence that A.M. had violated the DVRO during the one-year term and found that he was benefitting from the domestic violence program.  The trial court denied the request for renewal of the DVRO.

On appeal, R.G. insists the trial court erred by denying the DVRO by applying the wrong legal standard for renewal of a DVRO order.  She additionally argues that even if

2

the trial court applied the correct legal standard, it abused its discretion by denying the renewal of the DVRO.[2]

## FACTUAL AND PROCEDURAL HISTORY

### A.     REQUEST FOR DVRO

On April 1, 2022, R.G. filed a request for a DVRO against A.M. for her and Minors, who were 11 and 9 years old. R.G. alleged she had two previous restraining orders granted against A.M.; one in 2013, and one in 2020, but both had expired. R.G. and A.M. had been involved in two previous domestic violence cases in 2013. She sought a no-contact order for herself, Minors and S.A. (Minors' grandmother; hereafter MGM).

R.G. provided a declaration in support of the DVRO. A.M. had subjected her and Minors to emotional and physical abuse "in the past." She had sole legal and physical custody of Minors but she and A.M. were involved in a custody dispute in the Santa Clara Superior Court. Au.M. told R.G. that he had observed A.M. outside his school despite the school information being protected. A.M. contacted the local sheriff's department five or six times each year asking them to do a welfare check on Minors and R.G. He had asked for the same welfare checks when Minors stayed with MGM. The welfare checks scared Minors. She insisted that her home address was protected based on their custody agreement but A.M. had found their home. On March 23, 2022, A.M. pulled into their driveway in a black truck. Minors were playing outside. He told them

---

[2] A.M. has not filed a respondent's brief in this appeal.

"see you soon." Minors were traumatized by his presence [redacted]. She called the police. The restraining order was expired at the time and they advised her to get a new restraining order.

She also stated that at some time a white van was parked outside her home. There was a Hispanic man in a security shirt in the van who refused to identify himself to R.G.'s friend. Over the prior six months, she had seen vehicles parked outside her home. She insisted that A.M. was using these people to stalk her and Minors.

[Redacted.] R.G. further alleged that between 2021 and 2022 she received several fraudulent emails from several companies. These companies included strip clubs and drug rehabilitation centers. The emails all included her name and address, and that she had inquired of them for employment and treatment. She insisted that A.M. was responsible for sending the information to these companies.

R.G. provided exhibits to the DVRO request. This included the DVRO issued on September 6, 2013, expiring on September 5, 2018. Minors and R.G. were the protected persons. A.M. was to stay away from their home, work and school. R.G. also provided documentation that she had sole legal and physical custody of Minors. A.M. was only allowed supervised visits on Saturdays. R.G. attached photographs of a van parked outside her home. She also provided emails from the various companies that she believed were fraudulent.

A.M. filed a response to the request for the DVRO on April 14, 2022. He insisted that R.G. had only temporary custody of Minors and the custody case was ongoing. [Redacted.] A.M. insisted that between 2013 and 2018 there were joint restraining orders

4

for R.G. and A.M. to stay away from each other. In 2018, Mother was granted temporary sole physical and legal custody of Minors. He had visits with Minors in 2019 and Minors did not exhibit any fear of him. Between 2018 and 2020 he claimed that R.G. tried to make false reports to CPS about him but they were found to be inconclusive. Minors had texted him that they loved him on May 29, 2020.

He claimed that on March 23, 2022, he drove near R.G.'s house for work and saw Minors playing outside where they appeared to be unsupervised. He stopped and spoke with Minors, who seemed excited to see him. He did not see R.G. A.M. denied that he was having persons sit outside R.G.'s home in vehicles to watch her. She had no proof that he had anything to do with emails sent to her by various companies. He asked that the request for the DVRO be denied.

A.M. also included a minute order from the custody proceedings taking place in the Santa Clara Superior Court. During the proceedings on April 15, 2021, A.M. was granted three hours of supervised visits with Minors one time each week. R.G. was ordered to cooperate and transport Minors. He provided information that the company that was to help supervise the visits had not been able to set up the visits as R.G. was refusing to make Minors available to start the process. A.M. also included a minute order dated September 18, 2020, from Riverside County Superior Court, which dismissed the temporary restraining order that was issued on June 19, 2020, against A.M.

B.    HEARING AND RULING ON DVRO

R.G. testified. She admitted that she and A.M. were involved in a custody battle in Santa Clara Superior Court since 2013. R.G. and Minors lived in the Santa Clara area

5

previously but had since moved to Palm Desert. She testified regarding their relationship and that she had to obtain a restraining order in 2013 against him. On September 13, 2018, it was ordered that R.G. would have sole custody of Minors. A.M. was only allowed supervised visits one time each week. She insisted that the supervised visits had not been occurring because she was having trouble with the company that A.M. chose to supervise the visits. The custody case was still ongoing.

R.G. had requested the DVRO based on A.M. unexpectedly arriving at her home. Au.M. was terrified when A.M. showed up at the house. R.G. called the police but they told her that the prior DVRO had expired. She was also concerned about unknown vehicles parked in front of her house on various occasions. She believed that A.M. was involved because he was aware that another man was living with her and Minors, and could only know this if he was stalking her. A.M. was not supposed to know her address.

She also claimed that A.M. constantly called the local sheriff's department to do welfare checks on her, Minors and MGM. She insisted that a responding sheriff's deputy advised her that A.M. had made the calls claiming that R.G. was dead. The last call was three months prior.

[Redacted.] The trial court noted that A.M. had no contact with Minors for the prior three years. [Redacted.] She admitted that A.M. had no contact with Minors for the prior three years. Au.M. had informed R.G. that he had seen A.M. out in front of his school on multiple occasions.

The trial court believed that R.G. was afraid of A.M. but was focusing on any recent events in deciding whether to grant the DVRO. The trial court looked up R.G.'s

6

address and it appeared the house could be seen by a person driving by on the nearby highway. The trial court found credible evidence that R.G. was in fear of A.M. and that Au.M. still had trauma. The trial court wanted to focus on the recent conduct of A.M. in determining whether to grant the DVRO. R.G. insisted that he was stalking and harassing her based on coming to her home, which was a protected address, going to Minors' school and sending the police to do welfare checks.

MGM testified that Minors stayed with her one night each week and on some weekends. She indicated that on several occasions while Minors were staying with her, the sheriff's department came to her house to do a welfare check. They told her that A.M. had called and indicated that someone was dead at her house. There had been no calls for the prior six months. MGM also claimed that CPS had been to her home 15 to 20 times based on calls from A.M. that Minors were not safe. The sheriff's department and CPS only came to her house when Minors were with her. R.G. also testified that A.M. called CPS on her on multiple occasions. She did not know what he told them.

A.M. also testified. He insisted that he was driving down Highway 74 to a job site when he saw Minors playing outside their home. He had not seen Minors since September 2019 and was "overfilled with joy." He rolled down his window. He said hello and that he loved them. He also told Minors that he would see them soon. Minors did not appear scared and Au.M. did not immediately run into the house. He insisted he knew R.G.'s address because she put it on one of her filings in court and provided the document with the address. He was excited to see Minors because R.G. was not

complying with the visitation orders. He had not had a supervised visit since September 2019. R.G. had been impeding the supervised visits with Minors.

A.M. insisted he had only called CPS one time after a visit in September 2019 because Au.M. had a bruise [redacted]. A.M. called the sheriff's department only three times to do welfare checks on the advice of his attorney based on the failure of R.G. to respond on those dates to the company attempting to set up supervised visits. A.M. only had two contacts with Minors in the prior three years. On the day he went to R.G.'s house he only wanted to see Minors. He had no intent to harm them. He just wanted to get back custody of Minors. He had been married to another woman for three years and had a daughter who wanted to meet Minors.

The trial court was concerned that A.M. was not getting his supervised visits. The trial court also noted that the identity of a person who called CPS would be confidential. R.G. admitted that documents she obtained from CPS blacked out the name of the reporting party, but she insisted that a supervisor told her orally it was A.M. who was calling.

R.G. testified that she was granted sole custody of Minors because A.M. was deemed mentally unstable. She insisted that he was mentally and physically abusive to her during both her pregnancies. He told her that he killed small animals. He also ran over some of her things, including a mattress, when they broke up.

The trial court noted that it was not sure who was credible as to who was calling the sheriff's department and CPS. The trial court found MGM credible although her testimony was not detailed. The trial court stated, "So calling CPS and the sheriff's

8

department unjustifiably and repeatedly, if that be a fact, in my opinion, can support a restraining order." It was a significant "piece of evidence." The trial court sought proof from R.G. as to who was behind the calls and that there were more than three calls.

The trial court continued the matter and encouraged the parties to try to find evidence of who made the calls. Based on the current evidence, the trial court was not inclined to issue the restraining order.

During the continuance, R.G. filed further documents. She provided documentation pertaining to the custody proceedings, information regarding her interactions with the company that was to supervise visits, documentation from the prior restraining orders, photographs of her house from Highway 74, a declaration regarding Minors being terrified of A.M. based on past events, and details of A.M.'s past abuse of her.

A.M. filed a declaration and exhibits on April 29, 2022, in opposition to the grant of the DVRO. He provided evidence of only four welfare checks at R.G.'s residence. One in January 2021, two in April 2021, and one in June 2021. Each of those days was days that Minors were to be at supervised visits with A.M. There were two welfare checks at MGM's house in 2019 and 2020.

The second hearing on the grant of the DVRO was held on May 4, 2022. R.G. again testified about the welfare checks at her home. She admitted she had no proof on the logs of the calls that the calls were from A.M. She brought hundreds of pages of CPS records but they only went up to 2020. The trial court was unsure if they were relevant to the recent request for a DVRO. The last welfare check call to the sheriff's department

9

was July 25, 2021. She did not have the records for any calls to CPS after 2020. She insisted there were recent calls to CPS from A.M. making unfounded allegations that Minors were neglected. There were calls to CPS from A.M. made in 2022.

Representatives from the company that was hired to supervise A.M.'s visit with Minors testified that Minors, A.M. and R.G. had to participate in an in-person orientation prior to the visits being scheduled. R.G. refused to do the orientation in person or have Minors participate in the orientation. No supervised visits had occurred.

R.G. testified that in 2013, A.M. was ordered to complete a 52-week domestic violence course. A.M. admitted he only completed 24 weeks. A.M. acknowledged the welfare check calls but only two to MGM's residence and four to R.G.'s residence on days he was supposed to have visits with Minors. He only called based on the advice of his attorney. The last call was on June 30, 2021.

The matter was continued to May 9, 2022. At the next hearing, R.G. had additional CPS records. She had documentation of a call to CPS on April 23, 2021, by A.M. and a notation that he had made 18 previous referrals. The last call was on June 4, 2021. R.G. complemented the trial court for being the first to "truly" listen to all of her concerns and reasons for a restraining order.

The trial court noted there had been many unfounded reports made by A.M. to CPS over the years. This was a form of harassment. A.M. was aware that R.G. believed that he had [redacted], injured animals and damaged her belongings. She clearly did not want to have contact with him.

10

The trial court in ruling on the DVRO found that the definition of disturbing the peace under Family Code section 6320, subdivision (c), was so broad that it had "no choice" but to grant the DVRO. The trial court ruled there was insufficient evidence presented to grant the DVRO for Minors. It only granted the DVRO for R.G. and for a time period of one year. A.M. was ordered to complete the 52-week domestic violence program. The trial court noted that A.M. had already completed 24 weeks so he only had to complete the additional weeks. If he completed the program, the trial court would be inclined to terminate the DVRO early.

The trial court also noted that it believed that the case was on the "outer edge" of what constitutes disturbing the peace to justify the DVRO. The trial court also was concerned that R.G. seemed to be thwarting visitation but A.M. had no right to just visit Minors without supervision. [Redacted.] The DVRO would expire on April 1, 2023. On December 14, 2022, A.M. enrolled in the domestic violence course, which was set to start on December 20, 2022.

C.     DVRO RENEWAL REQUEST AND RULING

On January 3, 2023, R.G. filed a request to renew the DVRO on the grounds that A.M. had not completed the 52-week domestic violence program. She also filed a declaration. She stated that she was afraid that A.M. would "abuse me in the future" if the DVRO was allowed to expire. She acknowledged that since the issuance of the DVRO, there had been no welfare checks or harassment by A.M. She alleged that A.M. was mentally unstable. She was concerned that A.M. knew her address and would come to her home and harass her in the future. She was concerned that if A.M. did not

11

complete the domestic violence program prior to the expiration of the DVRO, he would again harass her. She requested a permanent restraining order, or for at least a period of five years.

A.M. filed a response to the request for renewal of the DVRO. He had not violated the DVRO and was enrolled in the domestic violence program.

A hearing was conducted on March 22, 2023, in front of the same trial court that granted the DVRO. A.M. had completed nine domestic violence classes. A.M. provided a progress report to the trial court. The trial court was "pleased" with A.M.'s progress. The trial court noted on the record, "If I didn't think that those concerns previously were valid, I wouldn't have granted the restraining order last year. . . . However, we're in a different posture now." The trial court stated its tentative ruling was to deny the renewal of the DVRO. The trial court believed that the prior concerns of R.G. were legitimate but it did not appear there was enough evidence presented in the written request to renew the DVRO.

R.G. now claimed that she had evidence that the harassment, stalking and abuse had not stopped. The trial court stated it was not fair to bring in new evidence that A.M. had to defend against without prior knowledge. She insisted that she had other "things" and that she was constantly trying to keep herself and Minors safe. She insisted the harassment by A.M. was contained in court filings in family court. She asked for a continuance to present the claims but the trial court denied any continuance. She insisted all she did was file things in court to respond to A.M.

12

The trial court advised R.G., "But there's a happy medium, which is hard to find in life, between protecting and overprotecting. Right? You have to see it from my perspective. I see the worst of the worst. [A.M.] is not the worst of the worst. Not close. I'm not even saying he's a bad person. I'm just saying, is he perfect? No. Are you perfect? No." He noted that Minors likely sensed the stress and anxiety of the court proceedings.

The trial court noted that the two parties oftentimes were in court on the custody matters and the restraining order and it wondered "if either of you have stepped back and said, are we really doing our children any good as opposed to doing what we think is good for ourselves?" The trial court expressed concern about R.G. It advised R.G. that she was an excellent parent but that life would be better for her, A.M. and Minors if they all spent less time in court.

R.G. expressed that Minors did not want to see A.M. The trial court stated that it hoped the relationship between A.M. and Minors could be repaired. The trial court also advised R.G. that she had a duty to foster a relationship between Minors and A.M. R.G. was concerned if the DVRO was not extended he would have no reason to complete the domestic violence program. The trial court stated that it was a good point but if he did not complete the course he would have no chance of getting joint custody of Minors.

The trial court advised R.G. that in granting the DVRO, it had made a finding of harassment. That finding was relevant in the custody proceedings. Further, even if the trial court denied the renewal of the DVRO, it did not stop her from filing a further request in the future. However, "It's just, here's what got us here and here's what new

13

and different events have happened since the time that you issued the first one. [¶] So I know you'd prefer not to have to do that. But what I'm trying to tell you is that the courthouse doors aren't necessarily closed in the future." R.G. stated that she never wanted to see A.M.'s face again. The trial court reminded R.G. that she was forever linked to A.M. because of Minors.

The trial court noted it had issued the DVRO because it found her credible. However, the evidence supporting the DVRO was not "overwhelming"; it was just enough. She "barely" met the burden of proof for issuing the DVRO. The trial court stated, "But I take that into consideration in determining whether or not to extend the restraining order now."

R.G. stated that the only thing that was keeping her safe was the DVRO. She acknowledged that CPS and the sheriff's department had not been called during the time of the DVRO but she insisted that "he's still watching me." A.M. insisted that he had moved on. He was benefitting from the classes. He would continue the classes because they were helping him. He had never been a threat to R.G. either physically or emotionally. He had been married to another woman for four years. They had one child and she was pregnant. He just wanted to be a father to Minors. He opposed the renewal of the DVRO for five years.

The trial court again noted that if A.M. failed to complete the domestic violence program, he would not be given joint custody of Minors. The trial court stated, "So he has all sorts of reasons to stay on the straight and narrow, as they say." He encouraged

R.G. to focus on Minors. He also warned A.M. that he would be subject to another restraining order if he harassed R.G.

The trial court concluded, "It's not going to take a whole lot more for me to grant another one. I hope we don't get to that point. But if she requests another one, she's not going to be charged fees. The sheriff will be probably likely the one to serve you. It will be heard on the next basis. We'll be right back where we are now. [¶] And no matter how well you're doing in the 52-week program, I'll still issue another restraining order if the evidence is there. Lord knows you've been in this building a lot. Don't do it to yourself. Don't do it to the kids. Both of you. Just stress and anxiety is not good for your kids." The request for renewal of the DVRO was denied. No formal judgment was filed and R.G. submitted a notice of appeal on September 12, 2023.

## DISCUSSION

R.G. contends the trial court erred by denying her request to renew the DVRO by relying on the wrong standard of law. The trial court failed to consider the mandatory factors in *Ritchie v. Konrad* (2004) 115 Cal.App.4th 1275 (*Ritchie*). Even if the trial court applied the correct standard, it abused its discretion by refusing to renew the DVRO.

Family Code section 6345, subdivision (a)[3] provides that a DVRO shall have an initial duration not exceeding five years, but "may be renewed, upon the request of a

---

[3] All further statutory references are to the Family Code unless otherwise indicated.

15

party, either for five or more years, or permanently, at the discretion of the court, without a showing of further abuse since the issuance of the original order. . . . The request for renewal may be brought at any time within the three months before the expiration of the orders."[4] "The legal standard for renewal of a DVRO is whether the protected party entertains a reasonable apprehension of future abuse. [Citation.] '[T]his does not mean the court must find it is more likely than not that abuse will occur if the protective order is not renewed. It only means the evidence demonstrates it is more probable than not there is a sufficient risk of future abuse to find the protected party's apprehension genuine and reasonable.' [Citation.] An imminent and present danger of abuse is not required; there must only be a reasonable apprehension that 'abuse will occur at some time in the future if the protective order is allowed to expire.' " (*Michael M. v. Robin J.* (2023) 92 Cal.App.5th 170, 179 (*Michael M.*).)

"In evaluating whether the requesting party has a reasonable apprehension of future abuse, the trial court ordinarily should consider the evidence and findings on which the initial DVRO was based." (*Michael M.*, *supra*, 92 Cal.App.5th at p. 180.) " 'Also potentially relevant are any significant changes in the circumstances surrounding the events justifying the initial protective order. For instance, have the restrained and protected parties moved on with their lives so far that the opportunity and likelihood of future abuse has diminished to the degree they no longer support a renewal of the order?' [Citation.] 'Also relevant are the seriousness and degree of risk, such as whether it

---

[4] Section 6345 was modified effective January 1, 2024, but the modification is not relevant to this appeal. (Stats. 2023, c. 874 (S.B. 459), § 2, eff. Jan. 1, 2024.)

16

involves potential physical abuse, and the burdens the protective order imposes on the restrained person, such as interference with job opportunities.' " (*Id.* at p. 180.)

On appeal, we review the trial court's decision on a renewal of a DVRO under the abuse of discretion standard. (*Rybolt v. Riley* (2018) 20 Cal.App.5th 864, 874-875.) " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason." ' " (*In re Marriage of G.* (2017) 11 Cal.App.5th 773, 780) "In reviewing the evidence, we examine the entire record to determine whether there is any substantial evidence—contradicted or uncontradicted—to support the trial court's findings." (*Curcio v. Pels* (2020) 47 Cal.App.5th 1, 12.) "We must accept as true all evidence supporting the trial court's findings, resolving every conflict in favor of the judgment. [Citation.] We do not determine credibility or reweigh the evidence. [Citation.] If substantial evidence supports the judgment, reversal is not warranted even if facts exist that would support a contrary finding." (*Ibid.*) " ' "If the court's decision is influenced by an erroneous understanding of applicable law or reflects an unawareness of the full scope of its discretion, the court has not properly exercised its discretion under the law." ' " (*In re Marriage of F.M. & M.M.* (2021) 65 Cal.App.5th 106, 116; see also *Michael M.*, *supra*, 92 Cal.App.5th at pp. 178-179.)

A.      CORRECT LEGAL STANDARD

Initially, R.G. is incorrect that the trial court applied the wrong standard in denying the renewal of the DVRO. .

In *Ritchie*, *supra*, 115 Cal.App.4th 1275, the appellate court addressed the standard of review in determining whether to renew a DVRO and the factors relevant to

17

the renewal. (*Id.* at p. 388) The *Ritchie* court identified three factors that a trial court should consider in deciding whether to renew a DVRO. These include, (1) "the evidence and findings on which [the] initial [protective] order was based"; (2) "any significant changes in the circumstances surrounding the events justifying the initial protective order"; and (3) "the 'burdens' the protective order imposes on the restrained party." (*Id.* at pp. 1290-1291.) The court concluded, "A trial court should renew the protective order, if, and only if, it finds by a preponderance of the evidence that the protected party entertains a 'reasonable apprehension' of future abuse. So there should be no misunderstanding, this does not mean the court must find it is more likely than not future abuse will occur if the protective order is not renewed. It only means the evidence demonstrates it is more probable than not there is a sufficient risk of future abuse to find the protected party's apprehension is genuine and reasonable." (*Ritchie*, *supra*, 115 Cal.App.4th at p. 1290.) At least one court has concluded that at least two of the *Ritchie* factors must be applied by trial courts in determining whether to renew a DVRO. (See *G.G. v. G.S.* (2024) 102 Cal.App.5th 413, 422.)

We need not decide if the *Ritchie* factors are mandatory—as will be shown *post*, the trial court did consider these factors in refusing to renew the DVRO.

We also note that R.G. contends the trial court failed to give a statement of decision as required by section 6340, subdivision (b). Under subdivision (b) of section 6340, the trial court need only give " 'a brief statement of the reasons for the decision in writing or on the record.' " (*Salmon v. Salmon* (2022) 85 Cal.App.5th 1047, 1060.) The trial court, at the hearing on the renewal of the DVRO, stated several reasons for the

18

denial. The trial court stated that it was pleased with A.M.'s progress in the domestic violence program and that he had an incentive to continue in order to obtain custody of Minors. Further, the trial court noted that A.M. was not the worst of the worst when it came to the reasons for granting the original DVRO. A.M. had not physically abused R.G., and the trial court had made no finding that [redacted]. The trial court also relied on the fact that the evidence supporting the original DVRO was minimal and barely supported issuing the original DVRO. These statements were clearly sufficient to satisfy section 6340, subdivision (b).

B.    THE TRIAL COURT DID NOT ABUSE ITS DISCRETION

R.G. further contends that if this court does not find the trial court misapplied the law, it was an abuse of discretion to deny the renewal of the DVRO. R.G. contends the facts underlying the initial DVRO supported renewing the DVRO; there were no changes in the parties' lives that weighed against renewal; and A.M. did not identify any meaningful burden imposed by a renewal of the DVRO.

The trial court did consider the evidence underlying the original DVRO in denying the renewal. The trial court presided over the original DVRO proceedings. In the original proceedings, the trial court allowed in years of records and heard testimony from R.G. about abuse that had occurred during their entire relationship. R.G. presented evidence that A.M. had called CPS with unfounded allegations that R.G. was not taking care of Minors. There was also testimony and records that A.M. called the local sheriff's department to initiate welfare checks at both R.G.'s and MGM's houses claiming they were deceased and the Minors needed care. It was undisputed that A.M. arrived

19

unannounced at R.G.'s house to speak with Minors when he was only supposed to have supervised visits with Minors. [Redacted.]

While the trial court did not find that the abuse occurred, it did find in support of the DVRO that there were unnecessary calls to CPS and the sheriff's department, and A.M. should not have gone to R.G.'s house. However, in determining whether to renew the DVRO, the trial court noted there were no further calls that had occurred since 2021. In addition, no calls to the police or CPS were made while the restraining order was in place. It found that the DVRO was "barely" supported by the evidence and could reasonably conclude that the need for a five-year extension or permanent order was not necessary to protect R.G.

Further, A.M. reported that he was learning how to deal with the situation in the domestic violence program. He had maintained his relationship with his wife, they had a daughter, and another baby on the way, evidencing that he had "moved on" from R.G. He wanted to be a father to Minors and had no intention to unnecessarily contact R.G. Although A.M. had only completed 9 weeks of the domestic violence program, he previously completed 24 weeks. He was near completion of the 52-week program. Further, as reasonably considered by the trial court, A.M.'s desire to obtain custody of Minors gave him an incentive to finish the program.

The trial court reasonably concluded that A.M. had made positive changes since the issuance of the DVRO, that there had been no further incidents, and that A.M. had

moved on.  The trial court did not abuse its discretion by concluding that the DVRO did not need to be renewed.[5]

## DISPOSITION

The order of the trial court is affirmed in full.  Appellant is to bear her own costs on appeal.[6]  (Cal. Rules of Court, rule 8.278(a)(1).)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
J.

We concur:

RAMIREZ
P. J.

McKINSTER
J.

---

[5] R.G. makes a final claim that the trial court erred by denying her request for a continuance of the renewal request hearing in order to provide additional information about A.M. stalking an harassing her after the issuance of the DVRO.  The trial court did allow R.G. to testify that there were statements in the court papers filed in the custody proceedings that R.G. considered harassing but the court found it did not make a difference.  R.G. does not provide what additional information would have been provided if granted the continuance.  Such failure to provide this information makes it impossible to review the issue on appeal.

[6] We do not award costs to A.M. because he did not make an appearance in this court.

21